UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STANLEY MORSBERGER and CLEMENTINE ELUH, individually and on behalf of all others similarly situated, ) ) ) | |
| Plaintiffs, ) | 22 C 1181 |
| ) | |
| vs. ) | Judge Jorge L. Alonso |
| ) | |
| ATI HOLDINGS, LLC, ATHLETIC & THERAPUTIC INSTITUTE OF NAPERVILLE, LLC d/b/a ATI Physical Therapy, ATI PHYSICAL THERAPY, INC., RAY WAHL, DOES 1-10, and ROES 1-40, ) ) ) ) ) | |
| Defendants. ) | |

## **Memorandum Opinion and Order**

Stanley Morsberger and Clementine Eluh allege in this putative class action that ATI

Holdings, LLC, Athletic & Therapeutic Institute of Naperville, LLC, d/b/a ATI Physical

Therapy, ATI Physical Therapy, Inc., Ray Wahl, John Does 1-10, and Jane Roes 1-40 engaged in

unlawful billing practices in a manner that violated the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, the Illinois Consumer Fraud and

Deceptive Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, the Maryland Consumer Protection

Act ("MCPA"), MD. CODE ANN., Com. Law § 13–101 *et seq.*, and state common law.

Defendants move under the *forum non conveniens* doctrine to dismiss the suit in favor of

arbitration, under Civil Rule 12(b)(6) to dismiss the complaint for failure to state a claim, and

under Civil Rule 12(f) to strike the complaint's class allegations. The Court denies the *forum non*

*conveniens* and Rule 12(f) motions. It grants in part and denies in part the Rule 12(b)(6) motion.

## Background

In resolving Defendants' Rule 12(b)(6) and Rule 12(f) motions, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Plaintiffs as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). The Court takes following facts are from Plaintiffs' complaint.

Morsberger and Eluh are Maryland citizens who were injured in accidents and ultimately received settlement payments in personal injury suits. Each was treated at an ATI Physical Therapy ("ATI") facility in Maryland. According to Plaintiffs, ATI is comprised of three "categories" of defendants who "associated together under the 'ATI Physical Therapy' umbrella to advertise, market, and otherwise conduct business as one entity": (1) ATI Physical Therapy; (2) the "Subsidiary Defendants," comprised of ATI Holdings, Athletic & Therapeutic Institute of Naperville, and Jane Roes 1-40; and (3) the "Management Defendants," comprised of Wahl (ATI Physical Therapy's COO) and John Does 1-10. Plaintiffs allege that Defendants engaged in "predatory, fraudulent, and illegal billing practices" by: (1) representing that they would submit Plaintiffs' claims to their insurance carriers but refused to do so; and (2) charging Plaintiffs the "full, rack-rate cost of services, instead of the insurance-negotiated rates they are contractually obligated to charge." Compl. ¶¶ 1-4, ECF No. 1.

The contracts that Plaintiffs refer to are between Defendants and Plaintiff's health insurers. Plaintiffs attach to the complaint a contract between ATI and Kaiser Foundation Health Plan and another between ATI and Aetna Network Service LLC. During the relevant period, Morsberger was insured by Aetna–MD, and Eluh by Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc..

At the Court's direction, Defendants filed what they say are the operative contracts governing ATI's relationships with Aetna and Kaiser during the relevant period. Plaintiffs argue that it is not apparent that the Kaiser Contract produced by Defendants even governs this dispute because it is between Kaiser and "ATL Holdings LLC DBA Pro Physical Therapy" and because Eluh received physical therapy at a location not listed in the contract. Defendants respond that "ATL" is merely a typographical error and that the contract should refer to "ATI." In any event, treating the Defendants' contracts as the operative contracts works in Eluh's favor because Defendants' Kaiser contract contains no arbitration clause. Accordingly, the Court considers Defendants' Kaiser contract as the operative contract.

## Discussion

## I.   **Motion to Dismiss for *Forum Non Conveniens***

Although Defendants initially argued that both Plaintiffs were required to arbitrate their claims, they now acknowledge that the Kaiser contract lacks an arbitration clause. Nevertheless, they continue to argue that both Plaintiffs must arbitrate their claims.

The Court finds Defendants' argument with respect to the Kaiser contract meritless. Defendants argue that Eluh must arbitrate her claims because the contract forbids ATI from billing her insurer. But even if true, that fact in no way forces Eluh to arbitrate her claims under

the Kaiser contract and Defendants identify no legal basis to suggest otherwise. Eluh, therefore, need not arbitrate her claims.

Defendants also argue that Morsberger must arbitrate his claims under the arbitration clause in the Aetna contract and move to dismiss his claims for *forum non conveniens*. *Forum non conveniens* is "the correct procedural mechanism to enforce an arbitration clause." *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 701 (7th Cir. 2022) (cleaned up). "A court must enforce an arbitration clause where (1) there is a valid agreement to arbitrate, (2) the claims fall within the scope of the agreement, and (3) the opposing party refused to arbitrate." *Id*.

Even though Morsberger is not a signatory to the Kaiser contract, Defendants argue that equitable estoppel requires enforcement of the arbitration provision against him. *See Brown v. Worldpac, Inc.*, Case No. 17-cv-6396, 2018 WL 656082, at *2-3 (N.D. Ill. Feb. 1, 2018). Before addressing whether equitable estoppel applies here, the Court must address a choice of law issue. The parties dispute whether Illinois or Maryland supplies the governing law over the *forum non conveniens* issues. But because the Court finds that the law is the same for either jurisdiction, there is no need to conduct a choice of law analysis.

Starting with Illinois, its law recognizes a detrimental reliance component. In *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 514, 812 N.E.2d 534 (Ill. App. 2004), for instance, the Illinois Appellate Court held that a party invoking equitable estoppel to force another party to arbitrate must show detrimental reliance. *See also ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012) ("In the absence of guiding decisions by the state's highest court, we consult and follow the decisions of intermediate appellate courts unless there is a convincing reason to predict the state's highest court would disagree."); *Warciak v. Subway Rests., Inc.*, 880 F.3d 870, 872 (7th Cir. 2018) ("In Illinois, '[a] claim of equitable estoppel exists

when a person, by his or her statements or conduct, induces a second person to rely, to his or her detriment, on the statements or conduct of the first person'") (quoting *Ervin*, 812 N.E.2d at 541) (alteration in original). Indeed, the court observed that "[a] claim of equitable estoppel exists where a person, by his or her statements or conduct, induces a second person to rely, to his or her detriment, on the statements or conduct of the first person. The party asserting a claim of estoppel must have relied upon the acts or representations of the other … and such reliance must have been reasonable." *Id*. at 541.

Defendants' attempt to distinguish *Ervin* is unpersuasive. Defendants argue that *Ervin* addressed circumstances where a non-signatory sought to enforce an arbitration clause against a signatory; while here, a signatory that seeks to enforce an arbitration clause against a non-signatory. But the Court fails to see any meaningful distinction in that difference. *Ervin* applies with equal force where, as here, a signatory seeks to compel a non-signatory to arbitrate. *See Premovic v. Northshore Univ. Health Sys.*, 2015 IL App (1st) 133466-U, ¶ 21 (applying *Ervin* where the defendant sought to compel the plaintiff to arbitrate based on an arbitration clause in a contract between the plaintiff's health insurer and the defendant). In addition, the contrary federal decisions cited by Defendants apply federal law, not Illinois law, and thus are inapposite.

Maryland law is in accord with Illinois law. In *Dickerson v. Longoria*, 995 A.2d 721 (Md. 2010), Maryland's highest court held that an estate could not be compelled to arbitrate under an equitable estoppel theory without detrimental reliance. In that case, the estate of a deceased nursing home resident brought a medical malpractice claim against the nursing home's owner. *Id*. at 725. The estate's personal representative, during the resident's lifetime, represented herself as the resident's agent and signed an arbitration agreement (ostensibly on the resident's behalf) upon the resident's admission to the nursing home. *Id*. at 725-26. The defendant argued

that the estate, a non-signatory to the arbitration agreement, was nonetheless bound by the agreement. *Id*. at 726. Maryland's highest court disagreed. *Id*. at 743.

In so holding, the court explained that "[t]o assert equitable estoppel, the asserting party 'must have been misled to his [or her] injury and have changed his [or her] position for the worse, having believed and relied on the representations of the party sought to be estopped.'" *Id*. at 743-44 (quoting *Creveling v. GEICO*, 828 A.2d 229, 246 (Md. 2003)). The court continued that it "[saw] no way—and [the defendant] has not asserted any ways—in which [the defendant] has changed its position for the worse based on [the representative's] assertion that she was acting on [the resident's] behalf when she signed the arbitration agreement. This is a necessary component of an equitable estoppel defense." *Id*. at 454 (citing *Creveling*, 828 A.2d at 246). *Dickerson* thus establishes as a principle of Maryland law that the party invoking equitable estoppel to force a non-signatory to arbitrate must show detrimental reliance. *See Kennedy v. ADF MidAtlantic, LLC*, Case No. JKB-15-0346, 2015 WL 6596918, at *5 (D. Md. Oct. 27, 2015) ("To the extent that Defendants may be trying to assert equitable estoppel against Kennedy, they have made no showing of detrimental reliance, a necessary element under Maryland law to invoke the doctrine, including in the arbitration context.") (citing *Dickerson*, 995 A.2d at 742-43).

Defendants cite three post-*Dickerson* decisions of Maryland's intermediate appellate court to support the opposite result. *See Griggs v. Evans*, 43 A.3d 1081, 1092 & n.5 (Md. Ct. Spec. App. 2012); *Hagerstown Block Co. v. Durbin*, Case No. 0737, 2015 WL 5926086, at *8 (Md. Ct. Spec. App. July 15, 2015); *WBCM, LLC v. BCC Properties, LLC*, Case No. 715, 2016 WL 7014414, at *6 (Md. Ct. Spec. App. Nov. 30, 2016). In ascertaining state law, a federal court "ordinarily give[s] great weight to decisions of [state] intermediate appellate courts, but where

one decision by an intermediate court seems to stray from the established course of the state's law, especially as written by the state supreme court, [the federal court] need not follow it." *KR Enterprises, Inc. v. Zerteck Inc.*, 999 F.3d 1044, 1051 (7th Cir. 2021). The three cases cited by Defendants stray from *Dickerson* and thus do not accurately reflect Maryland law.

In *Griggs*, the intermediate appellate court said this in a footnote:

> In enforcing arbitration agreements, "equitable estoppel," though invoked by bench and bar, may be a bit of a misnomer. While detrimental reliance is normally an element of equitable estoppel, most states that apply equitable estoppel, in the context of arbitration agreement enforcement, do so without requiring that the party invoking the doctrine prove detrimental reliance. *Schuele v. Case Handyman & Remodeling Servs., LLC*, 412 Md. 555, 563 n.3, 989 A.2d 210 (2010) (observing "that in the arbitration context 'equitable estoppel' is a misnomer because, unlike equitable estoppel in a contracts context, detrimental reliance is not required"). *But see Dickerson v. Longoria*, 414 Md. 419, 453-54, 995 A.2d 721 (2010) (declining to compel estate of nursing home patient to arbitrate dispute with nursing home where there was no evidence that nursing home "changed its position for the worse based on [personal representative's] assertion").

43 A.3d at 1092 n.5 (alteration in original).

In reaching its conclusion, *Griggs* relied on a footnote in *Schuele v Case Handyman*, a decision by Maryland's highest court. *Schuele* asked "whether under Maryland law a non-signatory to a contract may invoke equitable estoppel to enforce an arbitration provision contained within the contract." 989 A.2d at 213. But a jurisdictional defect "precluded [the court] from answering that question," so the court vacated the decision below, which had held that equitable estoppel does not require detrimental reliance in the arbitration context. *Id*. at 223. *Dickerson*, which Maryland's highest court issued several months after *Schuele*, proceeded to hold that equitable estoppel requires detrimental reliance in this context. Thus, in deciding whether *Dickerson* or *Schuele* establishes Maryland law, this court parts company with *Griggs* and sides with *Dickerson*. This court also parts company with *Hagerstown Block* and *WBCM*,

which, like *Griggs*, relied on the *Schuele* footnote rather than *Dickerson*. *See Hagerstown Block*, 2015 WL 5926086, at \*8; *WBCM*, 2016 WL 7014414, at \*6.

Accordingly, the Court finds that both Illinois law and Maryland law require a party invoking equitable estoppel, including in the arbitration context, to demonstrate detrimental reliance. On that question, Defendants argue in a footnote that "ATI entered into the Operative Aetna Contract and agreed to treat patients like Morsberger in accordance with its terms in reliance on the arbitration clause. Without the arbitration clause's assurances, ATI may have negotiated different contract terms before accepting patients for treatment." Defs' Supp. Br. 15 n.8, ECF No. 35. But that argument misses the mark because Defendants submit that they relied on a representation made by Aetna, not by Morsberger, the party against whom they seek to estop. *See Ervin*, 812 N.E.2d at 541 ("A claim of equitable estoppel exists where a person, *by his or her statements or conduct*, induces a second person to rely, to his or her detriment, on the statements or conduct of the first person) (emphasis added) (citation omitted); *Dickerson*, 995 A.2d at 743 ("To assert equitable estoppel, the asserting party must have been misled to his [or her] injury and have changed his [or her] position for the worse, having believed and relied on the representations *of the party sought to be estopped*.") (emphasis added) (alterations in original) (internal quotation marks omitted). And without detrimental reliance, Defendants cannot use equitable estoppel to require Morsberger to arbitrate his claims.

## II.     Motion to Dismiss for Failure to State a Claim

### A.     Purported Defects Applicable to Several or All Claims

Next, Defendants identify what they claim to be defects in several or all of Plaintiffs' claims. The Court addresses each argument in turn.

1.    ***Whether Defendants' Conduct was Permitted by Illinois Law and the Governing Contracts***

Defendants first argue that Plaintiffs' claims fail as a matter of law because their conduct was permitted under the Illinois Health Care Services Lien Act, 770 ILCS 23/5, 10(a), and the governing contracts. Defendants' point to three cases—*Rogalla v. Christie Clinic, P.C.*, 341 Ill. App. 3d 410 (4th Dist. 2003); *Barry v. St. Mary's Hospital Decatur*, 2016 IL App (4th) 150961; and *Turner v. Orthopedic & Shoulder Center, S.C.*, 2017 IL App (4th) 160552—arguing that the culmination of these opinions forecloses Plaintiffs' theory of relief. The Court disagrees.

In *Rogalla*, the court held that a medical provider had a subrogation claim and lien over a tort settlement under the Physicians Lien Act. 341 Ill. App. 3d at 418-19. Importantly, the court found that the agreement between the defendant and health maintenance organization that specifically preserved the provider's rights to recoup payments incurred because of a third-party tortfeasor. *Id.* at 418.

Next, in *Barry*, the court held that a facility agreement between a hospital and patient's insurer did not require the hospital to bill the insurer prior to seeking a lien against the patient's settlement proceeds. 2016 IL App (4th) 150961, ¶ 50. There, the court rejected the plaintiff's attempt to read into the Lien Act a requirement that the provider bill the insurer first. *Id.* Instead, the court looked at the language of the contract, which it found permitted the provider to seek payment (at a discounted rate) from any third-party tortfeasor before attempting to collect from the insurer. *Id.* at ¶ 58.

Finally, in *Turner*, the court affirmed summary judgment for a medical provider, finding that the breach of contract claim, dressed up as a consumer fraud claim, failed because there was no language in the agreement between the insurer and provider requiring the provider to accept

health insurance payments as full satisfaction. 2017 IL App (4th) 160552, ¶ 45. Notably though, the court concluded that a health-care provider could contractually agree to do so. *Id.* at ¶ 55.

These cases do not stand for the proposition that a health-care provider can bill a patient directly without regard to what the governing insurance agreement says, as Defendants seem to suggest. Nor do these cases support the conclusion that billing a patient directly for services can never violate a consumer protection statute. Rather, these cases merely state that a provider does not violate the Lien Act by directly billing a patient. In each case though, the court looked to the language governing the contract to determine whether such practices were allowed.

But even if Defendants could place liens on Plaintiffs' settlement proceeds under the Lien Act, Plaintiffs do not premise their claims on a violation of that statute. Rather, Plaintiffs bring claims premised upon what Defendants represented to them: that they would bill their insurance, at a discounted rate, before attempting to collect from the Plaintiffs themselves. Thus, even if Defendants could permissibly bill the settlement proceeds under the Lien Act, Defendants have not addressed Plaintiffs' allegations regarding Defendants misrepresenting their billing practices, which is the gravamen of Plaintiffs' claims. Accordingly, dismissal on this ground is not warranted.

2.      *Whether Plaintiffs Allege Cognizable Losses*

Defendants argue that Plaintiffs identify no losses because their third-party tort recovery compensated them for medical expenses, including physical therapy treatment. As a result, Defendants say, Plaintiffs seek a windfall that they are not entitled to. But Plaintiffs' complaint does not explain if Plaintiffs' settlements were calculated to fully compensate them for their medical expenses and, if so, how those medical expenses were calculated. Indeed, Plaintiffs allege that "Defendants' scheme is often devastating to patients who have recovered money in a

10

personal injury lawsuit, who then forfeit much more of their recovery than anticipated," and that "Plaintiffs and Class members were damaged in tangible ways by this practice since this practice denies them the benefits of their health insurance's lower medical costs and requires them to pay Defendants a greater percentage of their settlement/judgment during the lien resolution process." Compl. ¶ 11, ECF No. 1.

At this stage, the court must draw reasonable inferences in Plaintiffs' favor, and it is reasonable to infer that Plaintiffs paid Defendants more from their respective settlements than they had allocated during the settlement process to cover physical therapy expenses. The Court, therefore, declines to dismiss Plaintiffs' complaint on this basis.

### 3. *Whether Plaintiffs Adequately Allege Causation*

Defendants also argue, belatedly, that Plaintiffs fail to "allege that, save for [a] heavily caveated new-patient packet, they even saw any of [ATI's] so-called False Advertisements—let alone that the advertisements proximately caused their injuries, a requirement for consumer fraud and RICO claims." Defs.' Mem. 9-10, ECF No. 25. This argument, raised in Defendants' reply brief, is forfeited. *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019) ("[A]rguments raised for the first time in a reply brief are waived.").

But even if the argument had been timely raised, it would not doom Plaintiffs' claims. Plaintiffs allege that ATI's "Notice of Responsibility forms" say "We will submit charges for your visits to your primary and subsequent insurance companies." Compl. ¶ 51, ECF No. 1. They further allege that each plaintiff signed a Notice of Financial Responsibility and that "[h]ad Defendants adequately disclosed their billing practices, Plaintiffs … would not have sought treatment from ATI Physical Therapy." *Id*. at ¶¶ 193, 212. Also, that Morsberger's physician referred him to ATI, as argued by Defendants, does not undercut Morsberger's allegations that

he received and signed ATI's Notice of Financial Responsibility and would not have sought treatment from ATI had Defendants adequately disclosed their billing practices.

### 4. *Whether the Voluntary Payment Doctrine Applies*

Defendants next argue that Plaintiffs' claims fail because of Illinois's voluntary payment doctrine. This doctrine is an affirmative defense. *See Harris v. ChartOne*, 841 N.E.2d 1028, 1031 (Ill. App. 2005). Winning dismissal based on an affirmative defense is an uphill battle: "[A] plaintiff ordinarily need not anticipate and attempt to plead around affirmative defenses." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). As a result, dismissal is appropriate only if the complaint's factual allegations unambiguously establish all the elements of the defense. *Id*. "In other words, the plaintiff must affirmatively plead himself out of court." *Id*. (internal quotation marks omitted).

So, the question is whether Plaintiffs' complaint unambiguously establishes all the elements of a voluntary payment defense. Illinois's voluntary payment doctrine, "stated succinctly, maintains that absent fraud, coercion or mistake of fact, monies paid under a claim of right to payment but under a mistake of law are not recoverable." *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010) (cleaned up); *see also McIntosh v. Walgreens Boots All., Inc.*, 2019 IL 123626, ¶¶ 21-24 ("The common-law voluntary payment doctrine embodies the ancient and universally recognized rule that money voluntarily paid under a claim of right to the payment and with knowledge of the facts by the person making the payment cannot be recovered back on the ground that the claim was illegal. … In addition to compulsion or duress, other recognized exceptions to the voluntary payment doctrine include fraud or misrepresentation or mistake of a material fact.") (internal quotation marks omitted).

Plaintiffs argue that they did not have full knowledge of the facts when they submitted their payments because, based on Defendants' representations that they would submit their claims to their health insurers, Plaintiffs understood that they had done so and that Defendants' fraud was designed to conceal the facts from Plaintiffs and class members, thus foreclosing any investigation into such facts. This is not wholly responsive to Defendants' argument that Plaintiffs fail to allege why they could not have investigated or discovered, with a simple call to their insurers, whether their treatments had been billed to insurance. And precedent suggests that the mistake of fact and fraud exceptions are not available where "the facts were not obscured or inaccessible but, rather, that the plaintiff's lack of knowledge could be attributed to its lack of investigation into the defendant's claim of liability and the basis upon which the defendant was seeking the [payment]," *Harris*, 841 N.E.2d at 1032 (discussing *Goldstein Oil Co. v. Cnty. of Cook*, 509 N.E.2d 538 (Ill. App. 1987)); *see also Spivey*, 622 F.3d at 823-24 ("As the Illinois courts have explained, '[I]t is no exception to the voluntary-payment doctrine when the plaintiff makes no effort to ascertain the factual basis of the [charge] but pays it anyway.'") (alterations in original) (discussing a mistake of fact claim and quoting *Harris*, 841 N.E.2d at 1032).

Still, the court cannot say that Plaintiffs' complaint unambiguously establishes all the elements of a voluntary payment defense. *Hyson*, 821 F.3d at 939. For example, the complaint's allegations do not establish that there was no impediment to Plaintiffs investigating and discovering key facts on which they claim to have been misled—including the fact that they were charged the rack-rate cost of services instead of the insurance-negotiated rates Defendants were contractually obligated to charge. Accordingly, the Court will not dismiss Plaintiffs' claims based on this affirmative defense at this stage.

13

5. ***Whether Claims Against Wahl and the Doe Defendants Are Sufficiently Specific***

Plaintiffs' fraud-based claims are subject to the heightened pleading standard of Civil Rule 9(b). *See Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021) ("Where, as here, the alleged [RICO] predicate acts of racketeering involve fraud, the complaint must describe the 'who, what, when, where, and how' of the fraudulent activity to meet the heightened pleading standard demanded by Rule 9(b)."); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011) ("When a plaintiff in federal court alleges fraud under the ICFA, the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies."); *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) ("[Plaintiffs'] MCPA claim, which sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)."). Defendants insist that the claims against the Management Defendants (Wahl plus the John Doe Defendants) fail to satisfy Rule 9(b). They fault Plaintiffs for failing to specify which Management Defendants were involved in the alleged misfeasance; what role the Management Defendants played; what policies they set; when and how those policies were set; and where the policies are articulated. Defs.' Mem. 15-16, ECF No. 17.

But "Rule 9(b) does not require plaintiffs to plead facts to which they lack access prior to discovery." *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996); *see also, e.g.*, *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) ("Specificity requirements may be relaxed, of course, when the details are within the defendant's exclusive knowledge."). Defendants do not explain how, prior to discovery, Plaintiffs could learn the identities of the employees who set the alleged billing policies at issue, the specifics of those policies, when and how the policies were set, and/or where the policies are memorialized.

14

Further, Plaintiffs cite *P & P Marketing, Inc. v. Ditton*, which explains that:

> Where there are multiple defendants, the complaint must inform each
> defendant of the specific act allegedly committed by the defendant justifying
> his inclusion in a particular count. However, where the defendants are
> corporate insiders or control the actions of an entity, this requirement is
> subject to some modification, especially in situations where defendants are in
> a better position to know the extent of each defendant's participation in the
> complained of conduct. The key question is whether each defendant is given
> sufficient notice of their respective roles in order that they may answer the
> complaint.

746 F. Supp. 1354, 1362 (N.D. Ill. 1990). Defendants seem to accept this standard.

Applying that standard here, Plaintiffs give Defendants sufficient information. Plaintiffs

allege that the Management Defendants set billing policies at issue in this case, that those

policies stated that Subsidiary Defendants would not bill the insurers of patients suspected to

have sustained injuries to which third-party liability might attach, would directly bill such

patients the "rack-rate cost of services," and would place a lien on such patients' third-party

recoveries if the patients did not agree to pay the rack-rate charges. Plaintiffs further allege that

Defendants' purported RICO enterprise operated continuously for no less than four years to the

present. Given the pre-discovery factual landscape, Plaintiffs' allegations are sufficiently specific

to satisfy Rule 9(b).

### 6. *Statues of Limitations*

In a footnote at the end of their opening brief, Defendants note that "the Complaint's

allegations, which date back to 2017, are subject to relevant statutes of limitations" and list

various limitations periods. Defs.' Mem. 21 n.10, ECF No. 17. This footnote appears in a section

on Plaintiffs' class claims, and it is not entirely clear if it is merely an observation, if Defendants

attempt to raise a statute-of-limitations defense to all of Plaintiffs' claims, or if Defendants mean

to suggest that class treatment would be inappropriate because of the applicable statutes of

limitations. Because Defendants fail to develop this argument, it is forfeited. *See Harmon v. Gordon*, 712 F.3d 1044, 1053 (7th Cir. 2013) ("We have often said that a party can waive an argument by presenting it only in an undeveloped footnote.").

### B. RICO Claims (Counts I-III)

Next, Defendants argue that Plaintiffs fails to adequately plead the existence of a cognizable RICO enterprise. The Court agrees.

Plaintiffs bring counts under 18 U.S.C. § 1962(a), (c), and (d). To prevail on any of those claims, Plaintiffs must adequately plead the existence of a RICO enterprise. 18 U.S.C § 1962(a)-(c); *United States v. Volpendesto*, 746 F.3d 273, 284 (7th Cir. 2014); *Bobb v. Swartz-Retson P.C.*, Case No. 17-cv-7694, 2018 WL 4384292, at *6 (N.D. Ill. Sept. 14, 2018) ("Although there are significant substantive differences among the four RICO provisions, the existence of an 'enterprise' is fundamental to each provision.").

A RICO enterprise is broadly defined to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiffs attempt to allege an association-in-fact enterprise dubbed "ATI Physical Therapy." As noted above, Plaintiffs claim that Defendants (ATI Physical Therapy, Inc., the Subsidiary Defendants, and the Management Defendants) "associated together under the 'ATI Physical Therapy' umbrella to advertise, market, and otherwise conduct business as one entity." Compl. ¶¶ 5-6, ECF No. 1.

Defendants respond that Plaintiffs fail to allege a cognizable enterprise, arguing that the Seventh Circuit has held that a corporation and its subsidiaries or employees do not form a RICO enterprise. For instance, in *Fitzgerald v. Chrysler Corp.*, "[t]he enterprise alleged, taken most broadly, [was] a 'Chrysler family' consisting of subsidiaries of the Chrysler Corporation engaged

in various facets of production, financing, and marketing of Chrysler automobiles, plus

Chrysler's dealers, plus trusts controlled by Chrysler that in essence resell retail installment

contracts for the purchase of Chrysler automobiles to the investing public." 116 F.3d 225, 226

(7th Cir. 1997). But this was insufficient to demonstrate an enterprise. *Id.* ("[T]he plaintiffs carve

up the medley of Chrysler entities into three different enterprises; but as none of the

combinations of different members of the Chrysler family adds up to a RICO enterprise, it makes

no difference how they are sorted.").

 The Seventh Circuit explained that "[r]ead literally, RICO would encompass every fraud

case against a corporation, provided only that a pattern of fraud and some use of the mails or of

telecommunications to further the fraud were shown; the corporation would be the RICO person

and the corporation plus its employees the 'enterprise.' The courts have excluded this far-fetched

possibility by holding that an employer and its employees cannot constitute a RICO enterprise."

*Id.* at 226 (collecting cases). *Fitzgerald* held "that where a large, reputable manufacturer deals

with its dealers and other agents in the ordinary way, so that their role in the manufacturer's

illegal acts is entirely incidental, differing not at all from what it would be if these agents were

the employees of a totally integrated enterprise, the manufacturer plus its dealers and other

agents (or any subset of the members of the corporate family) do not constitute an enterprise

within the meaning of the statute." *Id*. at 228.

 *Fitzgerald* left open the possibility that "a manufacturer could use its dealers or other

agents or affiliates in such a way as to bring about the sort of abuse at which RICO is aimed, in

which event it might be possible to characterize the assemblage as a RICO enterprise." *Id.*; *see

also Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323-24 (7th Cir. 1998). Plaintiffs, however,

do not make such a showing. Instead, they cite cases that are inapposite.

Several of Plaintiffs' cited cases do not squarely consider the question whether an enterprise exists—rather, they concern whether a RICO person is sufficiently distinct from the alleged enterprise, a requirement under some RICO subsections. *See Haroco, Inc. v. Am. Nat. Bank & Tr. Co. of Chi.*, 747 F.2d 384, 401-02 (7th Cir. 1984), *aff'd*, 473 U.S. 606 (1985)). Plaintiffs invoke *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001), in which the Supreme Court held that the president and sole shareholder of a closely held corporation was sufficiently distinct from the corporation to plead a RICO claim that the president was the RICO "person" and the corporation the RICO "enterprise." But showing legal distinctness does not demonstrate the existence of an enterprise. *See James Streibich Revocable Tr. of 2002 v. Flagstad*, Case No. 20-cv-2242, 2021 WL 1546439, at *5 (N.D. Ill. Apr. 20, 2021) ("[P]laintiffs emphasize that the corporate defendants are legally distinct from Flagstad, and while that's certainly true, it gets plaintiffs no closer to alleging an association-in-fact enterprise. Plaintiffs rely on *Cedric Kushner Promotions* … . But *Cedric* did not address plaintiffs' theory here: whether a group of companies with their common owner constitute an association-in-fact RICO enterprise when they commit crimes at their owner's direction."). In fact, the *Cedric* Court noted the difference between a corporate employee who uses a corporation to commit unlawful activity, as was the case in *Cedric*, versus a claim where a corporation is both the "person" and "enterprise." 533 U.S. at 164.

Plaintiffs also cite *3DGS, LLC v. Chai Trust Co., LLC* for the proposition that "[a] shareholder, parent company, and subsidiary could conceivably form a distinct enterprise." Case No. 19-cv-7524, 2020 WL 7353406, at *5 n.3 (N.D. Ill. Dec. 15, 2020). But that dicta appears more concerned with distinctness than with the existence of an enterprise. So too with Plaintiffs' cited passage of *Williams v. Ford Motor Co.*, 11 F. Supp. 2d 983, 988 (N.D. Ill. 1998). Finally,

Plaintiffs rely on *United States v. Horak*, 833 F.2d 1235 (7th Cir. 1987), a decision affirming a criminal conviction of a corporate subsidiary's employee under § 1962(c). But, as Defendants point out, *Horak* predates *Fitzgerald*. In sum, Plaintiffs' RICO claims must be dismissed because Plaintiffs fail to plead the existence of a cognizable enterprise.

### C.      Declaratory and Injunctive Relief (Count IV)

Plaintiffs seek declaratory and injunctive relief against all defendants under the Federal Declaratory Judgment Act, 28 U.S.C. § 2210 *et seq*. Defendants argue that this count should be dismissed because (1) the declaratory relief claim is duplicative of Plaintiffs' substantive allegations; and (2) Plaintiffs lack standing to seek injunctive relief because they have already paid the bills at issue and do not allege that they are likely to be subject to the same allegedly wrongful conduct by ATI in the future.

Plaintiffs fail to respond to these arguments or otherwise defend Count IV. Any such argument is thus forfeited and Count IV is dismissed. *See Boogaard v. Nat'l Hockey League*, 891 F.3d 289, 295 (7th Cir. 2018) ("[Plaintiffs-Appellants] do not—and cannot—deny that a district court may hold a claim forfeited if a plaintiff fails to respond to the substance of the defendant's motion to dismiss.").

### D.      ICFA Claim (Count V)

Plaintiffs allege violations of the ICFA. Defendants argue that Plaintiffs' ICFA claim is barred by the Illinois Supreme Court case *Avery v. State Farm Mutual Auto Insurance Co.*, 216 Ill. 2d 100, 835 N.E.2d 801 (Ill. 2005).

First, Defendants suggest that Plaintiffs premise their ICFA claim on mere breaches of contract, even if they are dressed up in the language of fraud. And *Avery* teaches that "breach of contractual promise, without more, is not actionable under the [Illinois] Consumer Fraud Act."

19

216 Ill. 2d at 169. Plaintiffs respond that the Complaint invokes extra-contractual representations, including on an ATI's website and standard client intake forms. In reply, Defendants argue that Plaintiffs' consumer fraud claims still fail because ATI's advertisements are intertwined with Plaintiffs' purported contract rights.

Defendants are wrong on that last point. Plaintiffs allege, for example, that Defendants' "Notice of Financial Responsibility forms" state: "We will submit charges for your visits to your primary and subsequent insurance companies." Compl. ¶ 51, ECF No. 1. Whether or not this statement is unlawful under the ICFA has nothing to do with the contracts' terms between ATI and Plaintiffs' health insurance providers. And Defendants do not argue that the Notice of Financial Responsibility is itself a contract between ATI and the individuals it treats.

Thus, Plaintiffs' ICFA claim is viable to the extent that it does not rely on alleged contractual breaches. But Plaintiffs—who in their ICFA claim purport to "re-allege and incorporate by reference the allegations contained in paragraphs 1 through 118 of this Complaint, and all other Counts plead herein," (Compl. ¶ 180, ECF No.1)—are admonished that their ICFA claim may not rely on purported breaches of contract. *See, e.g.*, Compl. ¶¶ 1-3, 34-36, 43, 45, 55, 57, 59-60, 82-83, 94, 123, 133, 150, 162, 176, ECF No. 1 (alleging that Defendants' behavior was prohibited by contract).

Second, and more persuasively, Defendants argue that Plaintiffs cannot bring their ICFA claim at all because the statute does not apply extraterritorially. *Avery* held "that a plaintiff may pursue a private cause of action under the [Illinois] Consumer Fraud Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." 216 Ill. 2d at 187; *see also Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 396 (7th Cir. 2009) (stating that this test applies to non-resident plaintiffs). "[T]here is no single formula or bright-line test for

determining whether a transaction occurs within" Illinois; "each case must be decided on its own facts." *Avery*, 216 Ill. 2d at 187.

Admittedly, this is a somewhat fuzzy standard. *See Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011). Fortunately, precedent gives some clarity on the issue. In *Martin v. Heinold Commodities, Inc.*, 510 N.E.2d 840 (Ill. 1987), for instance, the Illinois Supreme Court found that the nonresidents' claims occurred in Illinois where: (1) the contracts containing the deceptive statements were all executed in Illinois; (2) the defendant's principal place of business was in Illinois; (3) the contract contained express choice-of-law and forum-selection clauses specifying that any litigation would be conducted in Illinois under Illinois law; (4) complaints regarding the defendant's performance were to be directed to its Chicago office; and (5) payments for the defendant's services were to be sent to its Chicago office.'" *Morrison*, 649 F.3d at 536-37 (quoting *Avery*, 835 N.E.2d 801). In *Avery*, on the other hand, the ICFA did not apply to the lead plaintiff's claims. There, the lead plaintiff resided and garaged his car in Louisiana; his accident occurred in Louisiana; his estimate was written there; he received a relevant brochure there; the car was repaired there; and he dealt with Louisiana-based State Farm employees. *Morrison*, 649 F.3d at 537 (discussing and quoting *Avery*).

Plaintiffs argue that *Avery* does not bar their ICFA claim because ATI and its subsidiaries' principal places of business are in Illinois, ATI created the misleading advertisements in Illinois, the alleged fraudulent bills were sent from Illinois, and payments were made at ATI Physical Therapy's offices located in Illinois. As a result, Plaintiffs argue, the circumstances of their claims occurred primarily in Illinois.

But the Court finds that this case is more akin to *Avery* than to *Martin*. Plaintiffs reside in and are citizens of Maryland. Plaintiff Morsberger was injured in Maryland (the Complaint does

not specify where Plaintiff Eluh was injured) and both Plaintiffs were treated in Maryland. Plaintiffs do not allege that ATI executed its contracts in Illinois or that those contracts contained forum-selection or choice-of-law clauses favoring Illinois. Although "the place where a company policy is created or where a form document is drafted may be a relevant factor to consider in determining the location of a consumer transaction," it is not dispositive. *Avery*, 216 Ill. 2d at 187. Nor is it enough to allege "that a scheme to defraud was 'disseminated' from [a defendant's] headquarters." *Id.* at 189; *see also Phillips v. Bally Total Fitness Holding Corp.*, 372 Ill. App. 3d 53, 865 N.E.2d 310, 316 (Ill. App. 2007) ("Under *Avery*, plaintiffs' claim that the deceptive policies were devised in and promulgated from Illinois is not sufficient to establish a nexus with Illinois.").

Plaintiffs further allege that fraudulent bills were sent from Illinois and directed payment to Illinois and claim that they sent payment to Illinois. But many of these relationships could be inverted—i.e., to the extent ATI had to deal with Plaintiffs from Illinois, Plaintiffs had to deal with ATI from Maryland. *See Morrison*, 649 F.3d at 537. Ultimately, Plaintiffs fail to distinguish their circumstances from cases in which the plaintiff's claims were not cognizable under the ICFA. *See, e.g.*, *Landau v. CNA Financial Corp.*, 381 Ill. App. 3d 61, 886 N.E.2d 405, 408-09 (Ill. App. Ct. 2008). Plaintiffs' ICFA claim, therefore, is dismissed because the disputed transactions did not occur primarily and substantially in Illinois.

### E.   MCPA Claims (Count VI)

Plaintiffs allege violations of the MCPA. As with the ICFA, Defendants argue that mere breach-of-contract claims are not cognizable under the MCPA. Defs.' Mem. 18, ECF No. 17. Plaintiffs do not contest this but argue that their consumer fraud claims are premised not on contracts but on ATI's representations, advertisements, and communications to patients. As

22

explained above, the Court agrees with Plaintiffs on this point. Their MCPA claim survives the extent that it does not rely on alleged contractual breaches.

Again though, Plaintiffs—who in their MCPA claim purport to "re-allege and incorporate by reference the allegations contained in paragraphs 1 through 118 of this Complaint, and all other Counts plead herein," Compl. ¶ 198, ECF No. 1—are admonished that their MCPA claim may not rely on purported breaches of contract. *See, e.g.*, Compl. ¶¶ 1-3, 34-36, 43, 45, 55, 57, 59-60, 82-83, 94, 123, 133, 150, 162, 176, ECF No. 1 (alleging that Defendants' behavior was prohibited by contract).

### F. Unjust Enrichment and Money Had and Received Claims (Counts VII and VIII)

Plaintiffs also bring state-law claims of unjust enrichment and money had and received. Plaintiffs allege that Illinois law applies to their state-law claims. Although Defendants make a choice-of-law argument regarding the applicability of the arbitration clause in the Aetna contract, they make no such argument with respect to Plaintiffs' unjust enrichment and money had and received claims. The Court, therefore, assumes that Illinois law applies.

Under Illinois law, "a plaintiff may not pursue a quasi-contractual claim where there is an enforceable, express contract between the parties." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003). Recovery for unjust enrichment is unavailable where the conduct at issue is subject to an express contract between the plaintiff and defendant. *Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013). Similarly, "[a] money had and received claim is an equitable action and is similar to a claim for unjust enrichment." *Bueker v. Madison Cnty.*, 61 N.E.3d 237, 256 (Ill. App. 2016). It can be maintained either under a theory of an implied contract or under a theory of a quasi-contractual obligation. *Kaiser v. Fleming*, 315 Ill. App. 3d 921, 735 N.E.2d 144, 147 (Ill. App. Ct. 2000) (internal quotation marks omitted).

Plaintiffs' equitable claims fail as presently plead. In both Count VII and Count VIII, "Plaintiffs re-allege and incorporate by reference the allegations contained in paragraphs 1 through 118 of [their] Complaint, and all other Counts plead [t]herein." Compl. ¶¶ 216, 222, ECF No. 1. Those allegations and counts repeatedly assert that Defendants' behavior was contractually prohibited. *See, e.g., Id.* at ¶¶ 1-3, 34-36, 43, 45, 55, 57, 59-60, 82-83, 94, 123, 133, 150, 162, 176. Incorporating express contract allegations into an unjust enrichment or money had and received count is not proper pleading in the alternative. *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) ("While a plaintiff may plead breach of contract in one count and unjust enrichment and promissory estoppel in others, it may not include allegations of an express contract which governs the relationship of the parties, in the counts for unjust enrichment and promissory estoppel.") (cleaned up); *see also Bunzl Retail Servs., LLC v. Mid Atl. Med. Servs., LLC*, Case No. 21-cv-3761, 2022 WL 294751, at *4, *7 (N.D. Ill. Feb. 1, 2022) (dismissing equitable claims governed by Illinois law because the complaint "incorporate[d] its express contract allegations into the unjust enrichment and money had and received counts"). Thus, Plaintiff's claims as plead are not entirely premised on extra-contractual conduct as argued. Consequently, Counts VII and VIII are dismissed.

### III.     Motion to Strike Class Allegations

Defendants also move to strike Plaintiffs' class allegations. Rule 23(c)(1)(A) of the Federal Rules of Civil Procedure provides: "At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). Although "[m]ost often it will not be 'practicable' for the court to do that at the pleading stage, … sometimes the complaint will make it clear that class certification is inappropriate." *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 829

(N.D. Ill. 2013) (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also*

*Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011) ("Consistent with

[Rule 23(c)(1)(A)'s] language, a court may deny class certification even before the plaintiff files

a motion requesting certification."). That said, "[i]f … the dispute concerning class certification

is factual in nature and discovery is needed to determine whether a class should be certified, a

motion to strike the class allegations at the pleading stage is premature." *Buonomo v. Optimum*

*Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014) (internal quotation marks omitted); *see also*

*Mauer v. Am. Intercont'l Univ., Inc.*, 2016 WL 4698665, at *2 (N.D. Ill. Sept. 8, 2016) (same).

Only if the class allegations are "facially and inherently deficient" should a motion to strike be

granted. *Buonomo*, 301 F.R.D. at 295.

Plaintiffs allege a nationwide class, or, in the alternative, a Maryland subclass, defined as

follows:

> All persons who, during the timeframe of this Complaint: (a) sought and
> obtained physical therapy or other related services from Defendants; (b) who
> had health insurance; but (c) were billed in excess of their
> insurance-negotiated rates for physical therapy services (the "Nationwide
> Class").
>
> …
>
> All persons who, during the timeframe of this Complaint: (a) sought and
> obtained physical therapy or other related services from Defendants within the
> State of Maryland; (b) who had health insurance; but (c) were billed in excess
> of their insurance-negotiated rates for physical therapy services (the
> "Maryland Class").

Compl. ¶¶ 98-99, ECF No. 1. Defendants move to strike Plaintiffs' class allegations, arguing that

they are facially defective for at least four reasons. The court addresses each reason in turn.

First, Defendants say that Plaintiffs are not adequate class representatives under

Rule 23(a)(4) because they are bound by arbitration clauses. But, as explained above, the

contract between ATI and Kaiser contains no arbitration clause and the doctrine of equitable estoppel does not require Morsberger to arbitrate his claims.

Second, Defendants argue that variation in the "key provisions" of the provider contracts will require the court to engage in a contract-by-contract analysis. The Court interprets this as an argument that "questions of law or fact common to class members" do not "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). But because Plaintiffs' allegations also rely on representations to consumers in Defendants' advertisements and patient intake forms," Plaintiffs raise at least some class wide claims not dependent on the terms of their provider contracts. Further, Plaintiffs argue that the small number of agreements between Defendants and the health insurers all contain substantially identical hold harmless provisions and will not require contract-by-contract analysis. Defendants produce two governing contracts and do not say how many others exist or how those not-yet-produced contracts differ from one another. Because "discovery is needed to determine whether a class should be certified, a motion to strike the class allegations at the pleading stage is premature." *Buonomo*, 301 F.R.D. at 295 (internal quotation marks omitted).

Third, Defendants invoke the proposition that "[u]nfairness under the ICFA 'depends on a case-by-case analysis'" to suggest that claims under the ICFA and the MCPA are not amenable to class certification. *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 826 (N.D. Ill. 2013) (quoting *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010)); *see also* Defs.' Mem. 21, ECF No. 17. (quoting and citing *Hill*). But to say that "whether a practice is unfair depends on a case-by-case analysis," *Siegel*, 612 F.3d at 935, is not to say this determination requires a plaintiff-by-plaintiff analysis. And Defendants do not explain why fairness determinations under the ICFA and/or the MCPA would raise plaintiff-specific questions.

Fourth, Defendants say that Plaintiffs' proposed class definitions are "fail-safe" because they would improperly limit class membership to persons with (under Plaintiffs' theory) valid claims. A fail-safe class is "defined in terms of success on the merits." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015); *see also McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 799 (7th Cir. 2017) (describing a fail-safe class as a class "that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim") (internal quotation marks omitted). "A fail-safe class is impermissible because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *McCaster*, 845 F.3d at 799. For example, a class that is restricted to those "entitled to relief" is fail-safe because, if the court rules for the defendant and denies the class relief, then the court's judgment renders the class a null set. *See Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011). "The key to avoiding [the fail-safe class] problem is to define the class so that membership does not depend on the liability of the defendant." *Mullins*, 795 F.3d at 660.

Plaintiffs' proposed classes are not defined by success on the merits. As Plaintiffs point out, a class member could've been charged rates higher than their insurance negotiated rates—and thus be a member of the proposed class—but the Court could find that such charges were fully permissible. In that case, the class members would be members of the class and bound by an adverse judgment. Moreover, if Defendants' fail-safe argument had merit, it will not require striking Plaintiffs' class allegations, but rather would warrant refining the class definition at the class certification stage. *See Messner*, 669 F.3d at 825 ("[A fail-safe problem] can and often should be solved by refining the class definition rather than by flatly denying class certification.").

## Conclusion

The Court grants in part and denies in part Defendants' 12(b)(6) motion [16]. The motion is granted as to all but Plaintiffs' MCPA claim. Defendants' requests to dismiss under *forum non conveniens* and to strike under Rule 12(f) are denied. Plaintiffs' dismissed claims are dismissed without prejudice, and Plaintiffs will be given until April 28, 2023, to file an amended complaint. If Plaintiffs fail to replead any of their dismissed claims, the dismissal of such claim(s) will convert automatically to a dismissal with prejudice.

**SO ORDERED.**                                    **ENTERED: March 30, 2023**

_____
**HON. JORGE ALONSO**
**United States District Judge**